UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------

KERRY WALKER,

                              Plaintiff,

                                                      COMPLAINT

                                                      18 Civ. 7757

          -against-


GREYSTONE PROGRAMS, INC.
SYLVIA DOE, LYDIA ROE,
NYS JUSTICE CENTER FOR THE PROTECTION
OF PEOPLE WITH SPECIAL NEEDS, DENISE MIRANDA,
ITS EXECUTIVE DIRECTOR, and
LOUIS P. RENZI,

                              Defendants.
------------------------------------------------------------------

          Plaintiff KERRY WALKER, through the undersigned counsel MICHAEL D.

DIEDERICH, JR., complains of the DEFENDANTS as follows:

### Prefatory Statement

          This action seeks declaratory relief against the Defendant "Justice Center" and its
executive director and hearing officers, and seeks damages against the Greystone Program Inc.
two of its residents, and the hearing officer, for the violation of Plaintiff's civil rights.

          As to the Justice Center, Plaintiff will offer substantial evidence that its procedures are
constitutionally deficient, and that it is being used as a tool of racially discriminatory oppression
of Afro-American and minority workers.  This is actionable, for declaratory relief, under 42
U.S.C. § 1983.  Essentially, any racially biased employer can file a "complaint" of abuse or
neglect with the Justice Center, as to an employee that the employer wishes to fire because of
racial prejudice.  The Justice Center facilitates and enables the racially biased action of the
employer by "substantiating" a finding of abuse or neglect, but without providing the "subject"
with notice of the accusations against him or her, or providing any a meaningful opportunity to
provide a defense, or providing fundamental due process rights in an adversarial proceeding, or
allowing the subject a timely name-clearing hearing and timely hearing on the accusations.  The
subject is permitted to appeal the determination of neglect or abuse, but this hearing is not
provided promptly, but instead is provided 18 months or more after the Justice Center notifies the
subject's employer of the substantiated finding, thereby providing the employer with its desired
justification for firing the Afro-American or minority employee.  The Justice Center does not
provide an impartial adjudicator.  Rather, it employees its own employee as the hearing officer.
The hearing officer knows that the administrative "convictions" justify the Justice Center's
existence, and that finding a sufficient number of subjects innocent could easily justify doing

away with the Justice Center, or at least scaling back its operations.  In other words, finding subjects innocent imperils the employment and personal financial security of the Justice Center investigators, its prosecutors, and its "judges."

As to the Greystone Program Inc. defendants, the corporation as employer is liable under 42 U.S.C. § 1981 for the race-based termination of Plaintiff's at will contract of employment, and the corporation and two individuals residing at Greystone's facilities (namely, Sylvia Doe and Lydia Roe) conspired to deprive Plaintiff of her civil rights, actionable under 42 U.S.C. § 1985.

As to the Justice Center hearing officer's "adjudication" that Plaintiff was guilty of neglect, Plaintiff asserts a supplemental claims under New York State law, including under the equal protection clause of the N.Y.S. Constitution, and under Article 78 of the N.Y.S. Civil Practice Law and Rules (which statutory relief is the codification of common law writs of certiorari, mandamus and prohibition).

## THE PARTIES

1.  Plaintiff Kerry Walker is, and was at all times relevant herein, citizen of the United States and a resident of the County of Orange, State of New York.

2.  Defendant Greystone Programs, Inc. (hereinafter "Greystone"), upon information and belief, is and at all times relevant herein was a business corporation organized and existing under the laws of the State of New York, with headquarters located at 700 South Drive,  Suite 203, Hopewell Junction, NY 12533, in Dutchess County, New York.

3.  Defendant Sylvia Doe (hereinafter "Sylvia" or "Sylvia Doe"; actual last name to be provided under seal), upon information and belief, is an "honorary" member of the board of directors of Greystone and is a resident of the County of Dutchess, in the State of New York.

4.  Defendant Lydia Roe (hereinafter "Lydia" or "Lydia Roe"; actual last name to be provided under seal), upon information and belief, is a resident of the County of Dutchess, in the State of New York.

5.  Defendant Justice Center for the Protection of People with Special Needs (hereinafter "Justice Center") upon information and belief, is and at all times relevant herein was an agency of New York State government, with central offices located at 161 Delaware Avenue, Delmar, New York 12054-1310, in Albany County.

6.   Defendant Denise Miranda, upon information and belief is the Justice Center's Executive Director and is a resident of the County of Albany, New York.

7.   Defendant Louis P. Renzi, upon information and belief, is employed by the Justice Center as a lawyer and/or hearing officer or "Administrative Law Judge," and upon information and belief is a resident of the County of Albany, New York.

## JURISDICTION AND VENUE ALLEGATIONS

8.   This court has jurisdiction over this action under 42 U.S.C. § 1981, § 1983, § 1985, and under 28 U.S.C. § 1331 and § 1343(4), and supplemental jurisdiction under 28 U.S.C. §1367.

9.   Venue is proper in this Court.

## FACTUAL ALLEGATIONS

Overview

10. Plaintiff became an employee of the Greystone in 2012, as a "Direct Support Professional" (DSP).

11. She was assigned to Greystone's "Universal IRA" facility in Wappinger's Falls, New York in around March 2013.

12. Plaintiff is an Afro-American woman from Jamaica, the West Indies.

13. Plaintiff was subjected to unlawful race discrimination at Greystone.

14. Greystone, aided by a racially biased resident who desired that Plaintiff be fired, falsely and in bad faith reported to the Justice Center that Plaintiff had committed abuse and neglect at its facility.

15. The residents Sylvia and Lydia concocted the false allegations, which are demonstrably false.

<u>Justice Center and its hearing officer as aiders and abetters to racial bias</u>

16. The Justice Center, as *de facto* hatchet man and facilitator of employer discrimination, prosecuted the allegations and in irrational and biased fashion, upheld the Justice Center's prior "substantiation" of the neglect and abuse allegations.

17. The Justice Center's process and procedures lack basic due process protections, and its hearing officers are functionaries who job (as they understand it) is to uphold the Justice Center's "substantiated" determination of neglect or abuse.

18. Under the statutory framework, as applied by the Justice Center, employees are deemed "guilty until proven innocent."  They are essentially given a Scarlet Letter by the Justice Center, without any meaningful input into the Justice Center's decision-making, and this Scarlet Letter G (guilt) is then communicated from the Justice Center to the employee, who then views itself as justified in terminating the employee's (the "subject's") employment—the employer's discriminatory goal all along.

19. As to the Justice Center characterization of the employee (such as Plaintiff) as a wrongdoer, which characterization is published outside the agency, including to the employer and future employers, the Plaintiff is afforded no timely name-clearing hearing by the Justice Center or the State of New York.

20. Thus, the Justice Center brands the employee as an abuser or neglectful person without affording any pre-determination hearing, or any semblance of a fair hearing at the post-determination "amendment" (appeal) stage.

21. The "subject" employee is denied both a pre-determination hearing of any meaningful kind, prior to the Justice Center's stigmatizing "determination," and then is denied a fair, impartial and timely post-determination hearing.

22. The hearing officer's job, as employee of the Justice Center, appears to be to serve as a rubber stamp, to justify the Justice Center's original determination.  Upon information and belief, the hearing officers know that part of their job is to justify the Justice Center's existence (and the employment of both the Justice Center's staff and the hearing officers).

23. The Justice Center's entire process appears to be a bogus, self-serving sham that abuses employees caught up in its bureaucratic net.   Accordingly, its determinations must be viewed as a nullity vis a vis the employer's actions.

24. This case is not an isolated example of Justice Center abuse.  Plaintiff's counsel believes that discovery will uncover many examples of Justice Center abuse.  Plaintiff's counsel is very familiar with another similar (and even more abusive) situation, namely, the matter of Rotimi Salu, whose appeal was heard on August 23, 2018.

25. The essence of the Justice Center's abuse is its facilitating of racial and ethnic bias against low-paid minorities who become the victim of employer race or national origin discrimination, where the employer used the tactic of false or pretextual accusations to then justify the termination of the employee, facilitated by the Justice Center's self-interested bias toward finding cases of 'abuse and neglect" in order to justify its existence as a state agency.

<u>Greystone and its residents as co-conspirators to deprive Plaintiff of her civil rights</u>

26. As to the employer here, Plaintiff complained that one of Greystone's residents, Sylvia Doe, was racially bigoted.   Plaintiff was ignored.

27. Greystone was also aware, from former Residential Manager Rina Nathan, that Sylvia would lie about staff, including lying about not being attended to.

28. Specifically, on one occasion (as documented in the Justice Center record) Sylvia lied about two staff members ignoring her needs, but then recanted her accusation after she learned that these staff members (whom she liked) could be fired.

29. As to the events in question, Greystone accepted as true the bald allegations of Syvia's roommate, Lydia Roe, which allegations were encouraged and supported by Sylvia, against Plaintiff, knowing full well that Plaintiff could be fired.

30. Greystone knew Plaintiff had previously complained that Sylvia was racially biased against her.

31. Greystone knew that its manager Rina Nathan had deemed Sylvia an "unreliable reporter."

32. Greystone knew that no physical injury had befallen Sylvia or Lydia on the night in question.

33. Greystone knew that Sylvia and Lydia needed staff to reposition them in their beds during the night.

34. Greystone knew that if Sylvia and Lydia were not repositioned, that this would result in redness or bed sores.

35. Greystone knew that Sylvia and Lydia had no visible redness or bed sores on their bodies after Plaintiff's shift and alleged inattention that evening.  This was clear physical evidence that Plaintiff had done her job, and had positions Lydia and Sylvia during the night.

36. Greystone knew that Sylvia and Lydia alleged that they yelled and screamed throughout the entire night, yet received no attention from staff (e.g., Plaintiff, who was allegedly neglectful and abusive in this regard, and Plaintiff's two other co-workers).

37. Greystone knew that <u>three</u> staff members were present that evening, to attend to the 8 residents, and that the residents voices could be heard at all locations on this one-floor residence.

38. Greystone knew its staff member had excellent records of doing their jobs.

39. Greystone knew that Plaintiff and her co-staff members attended to all other duties they were responsible for at the residence (as the Justice Center's hearing officer, Defendant Renzi, so found).

40. Thus, Greystone (and the Justice Center) was presented with a scenario where:

   a) the 3 staff members could hear voices or cries from Sylvia's and Lydia's room;

   b) the 3 staff members diligently did all their other assigned work;

   c) Sylvia and Lydia claimed to be screaming for help all night long, yet ignored by staff;

   d) Sylvia and Lydia had no injury, or redness or bed sores evidencing their claimed absence of attention (and thus exonerating Plaintiff); and

   e) Sylvia and Lydia both had motives to lie about not being attended to (e.g., Lydia's embarrassment about voiding in her diaper, and Sylvia's strong racial dislike for the Plaintiff and racial bigotry).

41.  Thus, there was no plausible reason for Greystone (or the Justice Center and its hearing officer) to believe the residents, especially where Sylvia had admitting to lying in making similar accusations against staff in the past, and instead to summarily reject the Plaintiff's rendition of facts and the testimony of her and other staff, together with the lack of any physical evidence against Plaintiff, where physical evidence (no redness or bed sores) proved that no inattention by Plaintiff occurred—Plaintiff had properly done her job on the evening in question.

Racial Bias within Greystone

42. Plaintiff had worked for the Greystone for several years, and encountered unlawful discrimination, which she reported.

43. Plaintiff also experienced and observed racial bigotry from resident Sylvia, and complained about it to Greystone's management. (Plaintiff also complained about unwanted sexual advances from a co-worker.)

44. Greystone took no action with regard to Plaintiff's complaints of discrimination, and did nothing to protect Plaintiff.

45. Upon information and belief, one reason for Greystone's inaction, and its "belief" in Sylvia's accusations against Plaintiff, is that Sylvia is an "honorary" member of Greystone's board of directors.  *See*, https://greystoneprograms.org/leadership/.

46. Thus, it appears that Lydia and Sylvia conspired to falsely allege inattention by Plaintiff for the purpose of getting Plaintiff' fired.   Sylvia knew, from the prior incident that Rina Nathan documented, that false accusations by a resident could result in an employee's job termination.

47. This was a conspiracy on Sylvia's and Lydia's part.

48. Greystone joined in, and itself (through its management officials) conspired with its residents Sylvia and Lydia to cause the termination of Plaintiff's employment because she is an Afro-American from Jamaica (and someone who had previously complained about unlawful discrimination), and thereby deprive Plaintiff of her civil right to equal employment opportunity.

49. Greystone's reporting of Plaintiff to the Justice Center was done to aid and facilitate its conspiracy to deprive Plaintiff of her civil rights, by ending her employment due to her race and national origin.

Justice Center denial of basic due process rights

50. The Justice Center denies "subjects" (employees accused of abuse or neglect) such as Plaintiff, of basic due process protections.

51. First, the subject is provided with no meaningful notice of the accusations against him or her prior to the Justice Center making a determination "substantiating" the accusation.

52. Second, after the Justice Center's unilateral substantiation of an accusation, with no ability of the accused subject to contest (or even input) the decision-making, the Justice Center

notified the subject's employer of its determination, thereby branding the subject as a person guilty of abuse or neglect, with governmental imprimatur, without any input or ability of the subject to defend his or her good name.

53. Essentially, the Justice Center brands the subject with a scarlet letter G, for "guilt," and this "determination" then is used by the employer to decide the employment fate of the subject—a decision which upon information and belief is almost always "fire," because what employer wants to keep employed a health care provider whom the government has determined to be abusive or neglectful (or a predator of patients, "bad people"—the characterization on the Justice Center's website[1]).

54. The Justice Center and State of New York provide a subject with "substantiated" charges with no timely name-clearing hearing.

55. The employee remains branded with the Justice Center's scarlet G (guilty) until at least such time as a hearing (what the Justice Center calls a hearing to "amend" the determination) is held.  Such hearing, upon information and belief, is ordinarily conducted no earlier than two years after the allegation of abuse or neglect.

56. For example, Plaintiff desired a hearing as soon as possible, and yet was provided with one only after well over 2 years elapsed.

57. Similarly, Rotimi Salu sought a prompt hearing and likewise had to wait for over two years.

58. During this huge wait, the Justice Center keeps the subject in the dark regarding the charges against him or her.  No specifics are given.  The subject can only guess as to what is actually alleged as abuse or misconduct.

---

[1] *See*, https://www.youtube.com/watch?v=702SCKlWYLk&feature=youtu.be  (Mission: "true partnership between the Justice Center and the work force" and "there are still a few predators, bad people, and that's where the Justice Center comes in")(*emphasis added*).

59. For example, in Plaintiff Walker's case, she did not receive paperwork showing the specifics of what was alleged against her until only 3 weeks before the Justice Center's "evidence" was sent to Plaintiff with cover letter dated January 23, 2018.  The Justice Center "amendment" hearing was scheduled for February 15, 2018.

60. Moreover, the Justice Center intentionally fails to preserve evidence that would protect the rights of subject employees.  For example, it could have obtained the interviews of Sylvia Doe and Lydia Roe on videotape, as this would have provided at least some direct evidence of possible incredulity.

61. The Justice Center appears to make it a practice of collecting evidence in a one-sided fashion, intended only to prove or bolster a case of wrongdoing, while intentionally omitting or failing to collect evidence that could aid the defense.

62. For example, in the matter of Rotimi Salu, the Justice Center investigator collected only bad quality video surveillance "still shots" of the relevant events, without sufficient legibility to determine the actual time of events, and it did not gather and preserve the actual surveillance video, which would have helped exonerate the subject, Mr. Salu.

Henchmen hearing officers –"non-judicial" tools of the Justice Center

63. The Justice Center purports to provide impartial hearing officers to adjudicate subjects' requests for amendment.

64. Nothing could be farther from reality.  Rather, Justice Center "administrative law judges" (ALJs) appear to be *de facto* Justice Center prosecutors, deployed in a manner similar to justice systems found in Stalinist Russia or Maoist China—"state" judges tasked with finding in favor of the State.

65. As such, the Justice Center's ALJs are entitled to neither absolute nor qualified immunity.

66. Some of the criteria applicable to deciding whether or not immunity should be granted to a "judge" are enunciated in the U.S. Supreme Court opinion *Butz v. Economou*, 438 U.S. 478, 512 (1978).  Some of these factors are set forth below, and each does not support a grant of any immunity for Defendant Renzi:

(a) *Butz* asks whether there are present safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct.  As to the Justice Center and its hearing officers, there are no safeguards.  Justice Center hearing officers can, and do, act injudiciously and with impunity, to uphold the will of their employer, the Justice Center.  There are no safeguards whatsoever against even blatantly depriving "subjects" of basic due process[2] and equal protection rights, for example:

> ➢ the right to meaningful notice of the abuse or neglect accusations against the subject,
>
> ➢ an opportunity to meaningfully respond to the allegations before being publicly branded (and the subject's employer informed) that the Justice Center has "substantiated" the accusation(s) of abuse or neglect;
>
> ➢ a meaningful opportunity for the subject to confront his or her accuser or accusers; and
>
> ➢ the right to a timely adjudication.

The absence of safeguards is particularly pernicious regarding Justice Center cases, because the Justice Center is fully aware that its subjects are most commonly members of minority groups in low-paying jobs, who then are fired as a result of the accusations and Justice Center "substantiated" findings.  The subjects thus have no income, and often for a considerable period of time because they are essentially "black-listed" or black-balled within their health care industry and deprived of their chosen occupation.

And to complete its oppression of the fired, black-listed subject, knowing full well the above realities, the Justice Center then takes years to finally afford the subject

---

[2] As to pre-determination and post-deprivation hearings and due process, the U.S. Supreme Court's opinion in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985) is instructive. Both determination require a fair and neutral decision-maker.

a formal purportedly-adversarial hearing (and a hearing which, as discussed in this complaint, is in reality no hearing at all).

(b)   *Butz* asks whether the "judge" seeking immunity from suit is insulated from political influence.  The Justice Center ALJs clearly are <u>not</u>:

> ➤ First, the Justice Center denies subjects the ability to inquire about the background, experience and credentials of the ALJ.  It is thus impossible to determine whether the ALJs are politically appointed, and perhaps even appointed conditioned upon the promise (express or implied) that the ALJ will "support the mission" of the Justice Center, with the mission being to virtually always to uphold the Justice Center's initial "substantiation" of accusations.

> ➤ Second, the Justice Center's ALJ leadership directs Justice Center ALJs to refuse to allow their *voir dire* as to their background, experience, credentials, judicial training (or lack thereof) and possible bias. [3]

> ➤ Third, the Justice Center, upon information and belief, was created because a N.Y.S. legislator's relative had been the victim of health care abuse or neglect, and thus its very creation had, in part, political purposes of making the Legislature appear to be safeguarding the vulnerable.  However, it appears to have become "politically correct" for the Justice Center to attempt to safeguard vulnerable residents, by totally ignoring the civil rights of vulnerable employees (especially employees vulnerable to malicious or biased employers).

> ➤ Fourth, the appointment of hearing officer is "political" in nature, and upon information and belief, is not through a competitive civil service appointment or otherwise transparent selection process.  It is possible that hearing officer dismissal is also political in nature.

> ➤ Finally, the Justice Center is a very small governmental agency, whose very existence is based upon the public and political perception that there is a need for this agency.  Thus, "convictions" demonstrate need—the more the better—and findings of innocence, especially if common, would compel an opposite conclusion.  Thus, Justice Center hearing officers have a vested financial self-interest in upholding findings against subjects, because convictions help ensure the hearing officer's future employment and financial security.

(c)   *Butz* asks about the importance of precedent to the judicial inquiry.  As to Justice Center prosecutions and hearing, legal precedent clearly is of no importance.  The

---

[3] The ALJ in the Rotimi Salu matter specifically telephoned her Justice Center superiors, to inquire whether or not she should submit to *voir dire* questioning.  The ALJ's superior(s) directed her to refuse.

only "precedent" followed by Justice Center hearing officers is the precedent that no evidentiary rules apply to the administrative prosecutor, who can dump the Justice Center's entire "investigatory" file on the lap of the hearing officer, who will then allow its admission in its entirety, undue prejudice and irrelevance notwithstanding, but conversely, find "irrelevant" and exclude (or ignore) evidence that may exonerate the subject.  Another "precedent" of Justice Center hearing officers is to deem employer handbooks or policies as akin to actual laws and regulations (which they are not) and then find a subject "guilty" of neglect because he or she deviated from an employer-drafted internal policy without independently determining whether the disregard of the employer policy somehow endangered the patient.[4] The other "precedent" followed by Justice Center hearing officer's is that basic principles of due process—notice of accusations, an opportunity to respond, the right to confront accuser, and the right to a timely adjudication—do not apply.

(d) *Butz* asks about the adversary nature of the process.  Justice Center hearings provide a façade of an adversarial proceeding, but this is really a sham, since all "evidence" submitted by the administrative prosecutor is accepted, and even hearsay-upon-hearsay admitted, and everything offered by the subject deemed irrelevant or disbelieved, even when any rational and impartial fact-finder would certainly find for the subject. The Justice Center hearing process is a show trial, nothing more. The basic rights of confrontation and impartial adjudication are denied as if such rights do not even exist in American jurisprudence.

(e) Finally, *Butz* asks about the correctability of error on appeal.  Defendant Renzi's Justice Center decision indicates that Plaintiff has the right to an Article 78 proceeding appeal (Plaintiff's supplemental claim herein).   Yet the hearing officer knows that no stenographer recorded the testimony, and thus there is no "record on appeal" from which to take a meaningful appeal (an Article 78 proceeding must be filed within 4 months).  Even if Article 78 proceeding relief were to be granted,

---

[4]  In the Rotimi Salu case, the only accusation of neglect was his supposed violation of an employer policy that, applied as strictly as the Justice Center's investigator thought it should be applied, became nonsensical and absurd (specifically—Mr. Rotimi was being accused of neglecting a juvenile patient by not have his "eyes on" the patent 100% of the time, when Mr. Rotimi was suddenly and unexpectedly violently attacked by another juvenile patient (where no harm or threat of harm befell the child he was supervising).

such would not correct the injustice or the State-sponsored institutional wrongdoing and deprivation of rights—the employee remains fired, the employee has suffered the Justice Center's blacklisting and likely been forced out of his or her chosen profession for years; and the employee has no means of economic redress against the Justice Center through an Article 78 proceeding.   "Correcting" the Justice Center's erroneous and abusive process and proceedings three or four years after the events does nothing to correct the injustice to the "subject."   Damages are not available through an Article 78 proceeding.

Defendant Renzi's acts and omissions

67. In the Justice Center hearing involving Plaintiff Walker, it appeared the "ALJ" simply took a template of prior ALJ determinations of guilt, plugged in the administrative prosecutor's allegations, and wrote a decision finding guilt, without any consideration whatsoever of the substantial—indeed, overwhelming—evidence of innocence.

68. Astonishingly, the hearing officer admitted testimony built on three layers of hearsay (what Sylvia and Lydia told Greystone's Ms. Fraleigh (its former employee), whose report was then read and testified to by her successor, Greystone's Ms. Witte), but conversely, the hearing officer gave no weight to the written statement of a Greystone manager who caught Sylvia lying—making a false statement about staff being inattentive to her, where she admitted her lie because she like those particular staff members.

69. The Witte testimony involved three levels of hearsay, yet was found fully credible by the hearing officer, whereas the Rina Nathan statement involved only two levels of hearsay and was clearly relevant, yet it was rejected in its entirety by the hearing officer (as it strongly impeached Sylvia's testimony).

70. Thus, the hearing officer found both Sylvia and Lydia "credible" notwithstanding that they did not testify; are mentally impaired (according to Greystone's records); had reasons to lie;

14

and their "credibility" was not established at all, but instead, was highly suspect due to all the other facts and circumstances, and the physical evidence that exonerated Plaintiff.

71. The hearing officer ignored (gave no weight) to basically all evidence supportive of the defense, and instead deemed decisive the facially implausible statements of Sylvia and Lydia (as expressed through three levels of hearsay:  Sylvia and Lydia, to Ms. Fraleigh, to Ms. Witte, to the hearing officer), and notwithstanding that the Plaintiff had no opportunity to confront these witnesses against her at any stage.

72. The only logical conclusion is that the hearing officer was essentially a tool of and rubber stamp for the Justice Center, whose job was to write a decision upholding the prior Justice Center "substantiation" of abuse and neglect.

73. Essentially, it is in the self-interest of the Justice Center and its hearing officers to convict subjects, regardless of actual evidence of guilt, in order to justify the Justice Center's existence (and thus the hearing officer's jobs).

Justice Center Executive Director Denise Miranda's acts and omissions

74. As executive director of the Justice Center (and thus presumably its leader and responsible official), Defendant Denise Miranda was either totally "asleep at the switch," or alternatively, affirmatively aiding and facilitating the Justice Center's deprivation of subject employees' constitutional and statutory rights, including Plaintiff's rights.

75. Defendant Miranda is allowing the processes by which subject employees, such as Plaintiff, are denied their due process and equal protection rights, as described above.

76. Defendant Miranda is apparently also allowing her agency's "investigator" to both investigate accusations (an "investigatory" function) and also to decide whether or not to prosecute such accusations (a prosecutorial function, akin to District Attorney's decision-making after receiving law enforcement investigators' input).

77. Thus, although Defendant Miranda heads her agency, it appears that neither she nor anyone else accountable to the public (in contrast to an elected district attorney) is responsible or accountable for the Justice Center's prosecutions and the abuses described in this complaint.

78. The Court must remedy this constitutionally defective and civil-rights violative N.Y.S. agency, as run by Defendant Miranda, a proper defendant for this Court's declaratory relief.

Breach of Contract Claim for Breach of Duty of Good Faith and Fair Dealing

79. Upon information and belief, Greystone breached implied covenants of good faith and fair dealing in how it treated Plaintiff in connection with the matters at issue here.

### FIRST CLAIM FOR RELIEF—
### RACIAL DISCRIMINATION IN TERMINATION OF EMPLOYMENT
### IN VIOLATION OF THE CIVIL RIGHTS ACT of 1866, 42 U.S.C. § 1981

80. Plaintiff's repeats and reiterates each of the allegations above as if fully repeated here at length.

81. Plaintiff's repeats and reiterates each of the allegations above as if full repeated here at length.

82. The Civil Rights Act of 1866, 42 U.S.C. § 1981, protects individuals from employment discrimination based upon race.

83. Plaintiff is an Afro-American woman from Jamaica discriminated against in the terms and conditions of her employment contract with Defendant on account of race.

84. Plaintiff has been unable, despite reasonable efforts, to find comparable employment.

85. As a further proximate result of defendants' actions, plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

86. Plaintiff has been damaged thereby.

87. The conduct of defendants was wanton, outrageous and malicious, was intended to injure plaintiff, and was done with reckless indifference to plaintiff's protected civil rights, entitling plaintiff to an award of punitive damages.

**SECOND CLAIM FOR RELIEF—**
**CONSPIRACY TO DEPRIVE OF CIVIL RIGHTS UNDER 42 U.S.C. § 1985**

88. Plaintiff's repeats and reiterates each of the allegations above as if fully repeated here at length.

89. The two residents who alleged claimed that Plaintiff had neglected them both, namely, Sylvia Doe and Lucy Roe (last names to be provided under seal), conspired to falsely accuse Plaintiff of neglect, for the purpose of interfering with and ending Plaintiff's employment with Defendant Greystone.

90. Resident Sylvia Doe, upon information and belief, also serves  as an "honorary member" of Greystone's Board of Directors.  *See*, https://greystoneprograms.org/leadership/.

91. Sylvia Doe indicated, before concocting the allegation that Plaintiff committed neglect, that Sylvia Doe intended to get Plaintiff fired from her Greystone employment.

92. Sylvia Doe previously lodged false allegations against staff, as identified by Greystone's manager Rina Nathan, who characterized Sylvia as an "unreliable reporter."

93. Sylvia Doe previously made statements that revealed her as a racially bigoted person.

94. Sylvia Doe concocted the allegations that Plaintiff committed neglect, and then inducted her roommate, Lucy Roe, to join in the fabricated story, for the purpose of getting Plaintiff fired.

95. The above two co-conspirators, Sylvia Doe and Lucy Roe, then enlisted the aid of other Greystone staff to further the conspiracy.  They joined the conspiracy.

96. Specifically Sylvia Doe enlisted Greystone to "investigate" the matter, where the

central witness against Plaintiff was Sylvia Doe.  Greystone accepted Sylvia Doe's rendition of

the facts, without independently examining the evidence.  Greystone accepted Sylvia Doe's

rendition, upon information and belief, because Sylvia Doe was both a patient and a member of

Greystone's board of directors.

97. Because the Greystone investigator knew (or should have known) that Sylvia was

racially bigoted, that she wanted Plaintiff fired, that her rendition of the facts was implausible, and

that she wanted others to support her effort in terminating Plaintiff's employment, the investigator

and her successor and supervisors became co-conspirators as well.

98. One aim of the above-referenced conspirators was to present false evidence to the

Defendant Justice Center, an agency of N.Y.S. government, for the purpose of justifying

Plaintiff's job termination and depriving her of her federally protected civil rights.

99. The Justice Center and its hearing officer then joined this conspiracy, by intentionally

supporting Greystone's and its residents' (Sylvia's and Lydia's) baseless assertions against the

Plaintiff.

100. Section 1985 of Title 42 of the United States Code provides in relevant part:

"**(1)**PREVENTING OFFICER FROM PERFORMING DUTIES
If two or more persons in any State … conspire to prevent, by … intimidation, or threat,
any person from … from discharging any duties thereof; …;

**(2)**OBSTRUCTING JUSTICE; INTIMIDATING PARTY, WITNESS, OR JUROR
If two or more persons in any State … conspire … for the purpose of impeding, hindering,
obstructing, or defeating, in any manner, the due course of justice in any State … , with
intent to deny to any citizen the equal protection of the laws, or to injure him or his
property for lawfully enforcing, or attempting to enforce, the right of any person, or class
of persons, to the equal protection of the laws;

**(3)**DEPRIVING PERSONS OF RIGHTS OR PRIVILEGES
If two or more persons in any State … conspire … for the purpose of depriving, either
directly or indirectly, any person or class of persons of the equal protection of the laws, or
of equal privileges and immunities under the laws; or for the purpose of preventing or
hindering the constituted authorities of any State … from giving or securing to
all persons within such State or Territory the equal protection of the laws; in any case of
conspiracy set forth in this section, if one or more persons engaged therein do, or cause to

be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his <u>person</u> or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators

101.    Due to the conspiracy between defendants Sylvia Doe, Lydia Roe, Greystone, the

Justice Center and hearing officer Renzi, and between some or all of them, to deny Plaintiff her

federal and state civil rights and right to equal employment opportunity, Plaintiff was damaged

thereby.

## THIRD CLAIM FOR RELIEF—
### DECLARATION THAT JUSTICE CENTER'S PROCESS AND PROCEDURES VIOLATED PLAINTIFF'S RIGHTS TO DUE PROCESS AND EQUAL PROTECTION UNDER THE FEDERAL AND STATE CONSTITUTIONALS

102.    Plaintiff's repeats and reiterates each of the allegations above as if fully repeated

here at length.

103.    As described in detail above, Plaintiff was deprived of a fair pre-determination

hearing, a fair post-deprivation hearing, a timely name-clearing hearing, a timely adjudicative

process, the right to confront her accusers, a fair and impartial hearing officer, and a record of the

proceeding or any adequate means to redress the wrongdoing done by the Justice Center and its

executive director and hearing officer.

104.    Plaintiff has been damaged thereby, and seeks declaratory relief.

## FOURTH CLAIM FOR RELIEF—
### REQUEST FOR INJUNCTION AGAINST JUSTICE CENTER'S EXECUTIVE DIRECTOR, AND JUSTICE CENTER, PROHIBITING CONTINUATION OF ITS CONSTITUTIONALLY DEFECTIVE PROCESS AND PROCEDURES

105.    Plaintiff's repeats and reiterates each of the allegations above as if fully repeated

here at length.

106.    This Court should grant an injunction against the Justice Center and its officials,

prohibiting the continuation of its constitutionally defective processes and procedures.

107.   The Justice Center's unlawful actions are ongoing, continue to damage Plaintiff, and require judicial correction and injunctive relief.

108.   Plaintiff requests a permanent injunction.

### FIFTH CLAIM FOR RELIEF—
### DECLARATION THAT JUSTICE CENTER'S PROCESS AND PROCEDURES VIOLATE DUE PROCESS AND EQUAL PROTECTION PROVISIONS OF THE N.Y.S. CONSTITUTION
### (supplemental claim)

109.   Plaintiff's repeats and reiterates each of the allegations above as if fully repeated here at length.

110.   This Court should declare that the Justice Center's processes and procedures violate the due process and equal protection provisions of the N.Y.S. Constitution under this Court's supplemental jurisdiction.

### SIXTH CLAIM FOR RELIEF—
### RELIEF UNDER CPLR ARTICLE 78
### (supplemental claim)

111.   Plaintiff's repeats and reiterates each of the allegations above as if fully repeated here at length.

112.   There is no substantial evidence supporting the Justice Center's supposedly adjudicative hearing.

113.   There is no evidence of physical harm to the residents Sylvia and Lydia caused by Plaintiff, nor relevant and material evidence that anything Plaintiff did or failed to do was "likely to result in physical injury…" within the meaning of N.Y.S. Social Services Law § 488(1).

114.   Thus, the Justice Center's determination was arbitrary, capricious, an abuse of discretion, in violation of state and federal statutory and constitutional law, and not supported by substantial evidence.

115.   This Court should grant Article 78 relief in this case, under its supplemental

jurisdiction.

### SEVENTH CLAIM FOR RELIEF—
### VIOLATION OF NEW YORK HUMAN RIGHTS LAW AND LABOR LAW CLAIMS
### (supplemental claim)

116.   Plaintiff's repeats and realleges each of the allegations above as if full repeated

here at length.

117.   Defendant's disparate treatment of plaintiff on the basis of her gender was in

violation of the New York State Human Rights Law and the equal protection clause of the N.Y.S.

Constitution.  *See*, N.Y.S. Exec. Law s. 296 *et seq*.

118.   Defendant Greystone was required to pay Plaintiff $14.75 under her union's

Collective Bargaining Agreement ("CBA") with Greystone, yet in breach of said CBA (and

Plaintiff's understanding of her contract of employment with Greystone), she was paid only 13.25

per hour.   This violated the parties' contractual understanding, and violate the N.Y.S. Labor Law.

119.   This non-payment of full wages, but rather payment of $1.50 per hour below the

contractual obligation was, it appears, the result of reprisal for Plaintiff's complaints, including

but not limited to both complaints of unlawful race and gender discrimination and complaints of

non-payment of wages due.

120.   Defendant Greystone's actions also constituted negligence and gross negligence, as

a breach of a duty of due care toward its employee, the Plaintiff.

121.   Plaintiff was damaged thereby.

### EIGHTH CLAIM FOR RELIEF—
### RETALIATION IN VIOLATION OF
### 42 U.S.C. § 1981 and other statutes

122.   Plaintiff's repeats and reiterates each of the allegations above as if full repeated

here at length.

123.   Plaintiff's reported and objected to unlawful discrimination by Greystone against

plaintiff and others, and had an objective and reasonable belief that defendant was engaged in

conduct unlawful under § 1981.

124.    Plaintiff also reported sexual harassment, and non-payment of N.Y.S. Labor Law-

required wages.

125.    Plaintiff opposed such unlawful conduct by making good faith claims or

complaints of discrimination to defendant.

126.    As a consequence, defendant engaged in adverse treatment of plaintiff.

127.    Plaintiff was damaged thereby.

## DEMAND FOR JURY
*Plaintiff hereby demands trial by jury in this action.*

WHEREFORE, Plaintiff prays that for a judgment containing the following relief:

1.  An award of plaintiff's actual damages in an amount to be determined at trial for loss of wages, benefits, and promotional opportunities, including back pay, and also an award of back pay and front pay compensating plaintiff for loss of past and future salary and benefits;

2.  An award of damages to be determined at trial to compensate plaintiff for mental anguish, humiliation, embarrassment, and emotional injury;

3.  An award of punitive damages;

4.  An order enjoining defendants from engaging in the wrongful practices alleged herein and to reinstate Plaintiff's employment with Defendant;

5.  Declaratory relief regarding the unconstitutional and civil rights-violative processes and procedures of the Justice Center and its executive director and hearing officers;

6.  An award of reasonable attorneys' fees and the costs of this action; and

7.  Such other and further relief as this Court may deem just and proper.

Dated:  Stony Point, New York
      August 26, 2018

/S/

MICHAEL D. DIEDERICH, JR.
*Attorney for Plaintiff   MD 2097*
361 Route 210
Stony Point, NY 10980
(845) 942-0795
Mike@DiederichLaw.com